OPINION OF THE COURT
Megan Tallmer, J.
Defendant was charged with various counts relating to his alleged sale of drugs to an undercover officer on May 11 and *204 May 18, 1998. Prior to trial, the People advised that as part of a long-term investigation, the undercover was equipped with a Kel transmitter during his conversations with defendant and that the undercover’s interactions with defendant were captured on both audio and videotape. The conversations between defendant and the undercover were in Spanish. The People indicated their intention to introduce into evidence translated transcripts of these conversations prepared by the undercover officer. Defense counsel sought and was granted a pretrial hearing to determine the audibility of the tapes.
At the audibility hearing, the court attempted to have the official court interpreter determine what words were said on the tapes. The court spent approximately two hours working on a two- to three-minute portion of the May 11 tape. Over that period of time, despite their best efforts, two different court interpreters were unable to make out more than isolated words. In most instances, the words heard by the court interpreters were not reflected on the undercover’s transcript and the transcript included words not detected by the court interpreters. Although the court does not speak Spanish, the court believed it was able to hear at least one word on the tape not heard by the court interpreter. It thus became clear that the tape could not be translated in open court by the official interpreter and that it would be fruitless to continue in this fashion.
In light of these difficulties, the People agreed to have new transcripts of the tapes prepared by a person who did not participate in the conversations.[1] The court asked that these transcripts be prepared in both Spanish and English so that the court would be able to follow the Spanish transcript phonetically. The audibility hearing was adjourned for several weeks to prepare these transcripts. The court also authorized the defense to hire its own interpreter.
FINDINGS OF FACT
At the adjourned audibility hearing Anzuris Loaiza testified on behalf of the People. I find Mr. Loaiza to be credible and make the following findings of fact and conclusions of law:
*205 Anzuris Loaiza is employed by the Office of the Special Prosecutor to translate for defendants testifying before the Grand Jury and to translate tapes, documents and agreements. Before coming to work for the Office of the Special Prosecutor, he was employed in a similar capacity with the District Attorney of Queens County. In January of 1999, Mr. Loaiza, a native of Colombia, was licensed as a Spanish interpreter by New York State. He is familiar with the dialect of the Dominican Republic from having lived in a Dominican neighborhood in Queens and from having attended college and worked with many persons from the Dominican Republic.
Using headphones, Mr. Loaiza listened to the audiotape of the May 11, 1998 conversation between 15 and 20 times and listened to the May 18, 1998 audiotape several times. He spent approximately three hours viewing the videotapes from both dates. It took Mr. Loaiza approximately 20 hours to prepare transcripts in Spanish and in English of the May 11 tape and about 8 to 10 hours to prepare the May 18 transcript. Although a small percentage of the tapes was inaudible due to street noise, static and overlapping voices, Mr. Loaiza was able to understand most of the tapes upon a first listening.
After preparing the transcripts, Mr. Loaiza met with the undercover officer for approximately two hours to discuss some words Mr. Loaiza was not sure about because of background noise. The undercover had prepared his own transcript, but Mr. Loaiza did not see that transcript. If the undercover told Mr. Loaiza he said words on the tape Mr. Loaiza did not himself hear, these words were not included in Mr. Loaiza’s transcripts. The final transcripts did not incorporate any words Mr. Loaiza had not heard prior to meeting with the undercover, but merely clarified questions Mr. Loaiza had concerning certain words or phrases.[2]
After Mr. Loaiza testified, the tapes were played for the court. Using the Spanish transcripts prepared by Mr. Loaiza, the court was able to follow the tapes in a way not previously possible. With the exception of a small portion of the May 11, 1998 tape that the People agreed to redact, the words on the tapes could be heard by the court and corresponded phonetically to the words reflected on the Spanish transcripts. The court credits Mr. Loaiza’s testimony that the Spanish transcripts prepared by him were accurate representations of the *206 words and sounds heard on the tapes and the English transcripts in turn were accurate translations.
CONCLUSIONS OF LAW
The determination whether to allow videotapes or audiotapes into evidence rests with the Trial Judge. (People v Lubow, 29 NY2d 58 [1971].) The trial court may conduct an evidentiary hearing to determine whether an offered tape meets a threshold requirement of audibility, that is, whether statements purportedly made on the tape can be heard and understood. (See, People v Godley, 130 AD2d 791 [3d Dept 1987].) Although the court initially had indicated concern over its ability to make the threshold determination of audibility due to the court’s unfamiliarity with Spanish — the language spoken on the tapes — the court later was satisfied that with the aid of Spanish transcripts it would be able to make a meaningful determination of audibility.
The Second Department has held that to be considered audible, an official court interpreter must be able to produce a satisfactory transcription of the conversation at the audibility hearing. (People v Carrasco, 125 AD2d 695 [2d Dept 1986].) In the instant case, the court interpreters were not able to provide a translation after hearing the tape in open court. The Second Department’s requirement, however, appears to be at odds with First Department cases, sanctioning the use of transcripts to aid the jury where the tape recording is made in a foreign language or in a dialect that amounts to a foreign language. (People v Reynolds, 192 AD2d 320 [1st Dept 1993], supra; People v Santos, 168 AD2d 392 [1st Dept 1990].) There is no indication in these decisions or in these records on appeal that the tapes in question were translated by the official court interpreter as a condition to being admitted into evidence. The First Department thus implicitly has rejected such a requirement.
A leading authority agrees that the admissibility of a tape recording should not depend on whether it can be understood when played in open court, but rather, “whether, however painstakingly, an accurate transcript of it can be prepared.” (Fishman and McKenna, Wiretapping and Eavesdropping § 24.2, at 24-6 [2d ed 1995].)
Applying these principles, the court is satisfied that the tapes sought to be admitted by the People sufficiently are audible to be submitted to the jury and that the transcripts prepared by Mr. Loaiza were accurate and reliable and could be submitted *207 to the jury as an aid to understanding the tapes.[3] Any disputes as to the actual words spoken on the tapes are factual issues to be resolved by the jury. Defendant is free to offer his own evidence as to the contents of the tapes or to submit alternative transcriptions. (See, People v Rodriguez, 205 AD2d 328 [1st Dept 1994].)

. Although the People agreed to have a person other than the undercover retranscribe the tapes, the First Department, unlike the Second Department, has rejected objections to the undercover’s participation in transcribing tapes. (Compare, People v Reynolds, 192 AD2d 320 [1st Dept 1993] [preparation of transcripts by undercover rather than by independent third party does not affect their admissibility], with People v Colon, 87 AD2d 826 [2d Dept 1982] [improper to allow jury to use transcripts prepared by undercover who participated in conversations].)

. Examples of clarification sought by Mr. Loaiza were the words “sistenti” versus “sistento” and “Florida” versus “Providence.”

. The People did not seek to introduce the tapes themselves on their direct case, but rather intended to rely solely upon the transcripts. Once the court indicated, however, that it would not inhibit the defense’s use of the tapes for cross-examination or on the defense case, the People agreed to put the tapes into evidence together with the transcripts and oral testimony by the undercover concerning his conversations with defendant.